AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information associated with Instagram User Account<br>"fendididthat", UID 27458219486 | )<br>)<br>)<br>)<br>)<br>) |

Case No. '22 MJ03027

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC secs. 1591, 2421 | Sex Trafficking of a Minor or By Force; Transportation for Prostitution |

The application is based on these facts:

See attached affidavit of FBI Special Agent Drew Mycka, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Drew Mycka, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date: _____08/18/2022_____

*William V. Gallo*
*Judge's signature*

City and state: San Diego, California

Hon. William V. Gallo
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Drew Mycka, Special Agent with the Federal Bureau of Investigation, being duly sworn, hereby state as follows:

### INTRODUCTION

1. I make this affidavit in support of an application for a search warrant for information associated with certain Instagram accounts that are stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), an electronic communications service and/or remote computing service provider headquartered at 1601 Willow Road in Menlo Park, California. As described further in Attachments A-1 and A-2, this request is made to search the following Instagram user Accounts:

a. "tfn.wes", UID 48496913054 (**Target Account 1**)

b. "fendididthat", UID 27458219486 (**Target Account 2**, and collectively, the "**Target Accounts**"),

for items that constitute, evidence, fruits, and instrumentalities of violations of federal law, specifically, violations of Title 18, United States Code, Sections 1591 and 2421, as more fully described in Attachments B-1 and B-2, for the time period from April 1, 2022 up to and including the date of this warrant for the **Target Accounts**.

2. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of namely, Title 18, United States Code, Sections 1591 and 2421, have been committed by NEELY. There is also probable cause to believe that a search of the **Target Accounts** as described in Attachments A-1 and A-2 will produce evidence, fruits and/or instrumentalities of the aforementioned crimes, as described in Attachments B-1 and B-2.

1

3.     The information set forth in this affidavit is based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation (including other law enforcement officers), my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of obtaining a search warrant for the **Target Accounts**, it does not set forth each and every fact that I or others have learned during the course of this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

4.     I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code.

5.     I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), United States Department of Justice. I have been a Special Agent since October 2014. I am currently assigned to the Child Exploitation Task Force of the San Diego Field Office, where I assist in the investigation of crimes concerning child exploitation and human trafficking. I have been employed by the FBI since September of 2009 and served as an Intelligence Analyst prior to becoming a Special Agent. I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer evidence seizure and processing, and various other criminal laws and procedures.

6.      My experience as an FBI SA has included the investigation of cases involving the use of computers and the internet to commit crimes. I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer evidence seizure and processing, and various other criminal laws and procedures. I have personally participated in the execution of search warrants involving the search and seizure of cellular telephones and other electronic devices.

7.      I have become familiar with Instagram and other social media sites through my investigations.  I have examined many Instagram accounts and I have learned that suspects often use social media sites for communications in an effort to bypass law enforcements attempts to uncover their criminal activity. Based on my training, experience, and communications with other law enforcement officers, I have learned specific techniques in being able to identify suspects and associates even when they use fictitious names or aliases within social media sites. Through my training, experience, and consultation with other law enforcement officers, I have learned that:

a.      Individuals involved in illicit commercial sex maintain records, including electronic files, related to their illicit business on computers and computer servers hosting internet applications such as electronic mail (email) and personal social networking web pages;

b.      Individuals involved in illicit commercial sex maintain records of correspondence relating to client contact information as well as travel and lodging arrangements involved in such illegal activity;

c.      Individuals involved in illicit commercial sex maintain documents and files containing names of associates and/or coconspirators involved in prostitution;

d.      Individuals involved in illicit commercial sex maintain financial records, bank statements, money orders, money order receipts, and cash that are evidence of payments made in conjunction with prostitution;

e.      Individuals involved in illicit commercial sex use social media sites like Instagram to find clients and prostitutes. They use Instagram messaging applications to communicate with prostitutes and customers to increase their mobility and coordinate illicit activities. They will often use multiple social media accounts in order to maintain contact with other pimps, prostitutes, complicit businesses, and clients. These social media accounts contain electronic data concerning instant messaging, electronic mail and social media addresses of co-conspirators and clients, as well as contact information for co-conspirators and clients. Individuals involved in illicit commercial sex also utilize social media to store and display, commonly known as posting, photographs, videos, and text of themselves as well as other coconspirators for the purpose of electronic advertising and promotion of prostitution.

9.      Based upon my experience and training, and the experience and training of other agents with whom I have communicated, the evidence of illegal activity described above in paragraphs "a" through "e" is maintained by individuals involved in illicit commercial sex in property that they and their associates live in and operate as well as on online accounts such as Snapchat, Instagram, and Facebook as well as email accounts, which can be accessed on computers and cellular telephones.

//

//

//

//

//

4

1

## BACKGROUND INFORMATION ON INSTAGRAM

2    10.    Instagram is a service owned by Meta, a United States company and
3    a provider of an electronic communications service as defined by 18 U.S.C. §§
4    3127(1) and 2510.  Specifically, Instagram is a free-access social networking
5    service, accessible through its website at http://www.instagram.com and through
6    its mobile application, that allows subscribers to acquire and use Instagram
7    accounts, through which users can share messages, multimedia, and other
8    information with other Instagram users and the general public. Instagram allows
9    its users to create their own profile pages, which can include a short biography, a
10   photo of themselves, and other information.

11   11.    Meta collects basic contact and personal identifying information from
12   users during the Instagram registration process.  This information, which can later
13   be changed by the user, may include the user's full name, birth date, gender, contact
14   e-mail addresses, physical address (including city, state, and zip code), telephone
15   numbers, credit card or bank account number, and other personal identifiers. Meta
16   keeps records of changes made to this information.

17   12.    Meta also collects and retains information about how each user
18   accesses and uses Instagram.  This includes information about the Internet Protocol
19   ("IP") addresses[1] used to create and use an account, unique identifiers and other
20   information about devices and web browsers used to access an account, and session
21   times and durations.

22

23   _____
24   [1] An IP address is expressed as groups of numbers separated by decimal points and
25   is unique to a particular device during an online session.  The IP address can be
     dynamic, meaning that the Internet Service Provider (ISP) assigns a different
26   number to a device every time it accesses the Internet.  IP addresses might also be
     static, if an ISP assigns a user's device a particular IP address, which is used each
27   time the device accesses the Internet.

13. Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

14. Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service. Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

15. Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments. Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

16. Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users. Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture

changes and additions.   Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users.   Users can also manually search for friends or associates.

17.   Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

18.   One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos.  Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location. These appear as posts on the user's profile.   Users can remove posts from their profiles by deleting or archiving them.   Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

19.   Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram.   Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@").   An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

20.   An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours.   Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted.   The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

21.    Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

22.    Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information.  Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot.  Instagram Direct also enables users to video chat with each other directly or in groups.

23.    Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps.  Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

24.    Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  Meta retains records of a user's search history and followed hashtags.

25.     Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

26.     Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

27.     In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

28.     For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

**FACTS IN SUPPORT OF PROBABLE CAUSE**

*Background on OCC*

29.     On August 10th, 2022, the FBI and the San Diego Human Trafficking Task Force (SDHTTF) participated in the FBI's national initiative, Operation Cross Country (OCC). The purpose of OCC was to identify, rescue, and recover underage victims of the commercial sex trade as well as identify, arrest, and

1    prosecute commercial sex traffickers. As part of this operation, undercover (UC)

2    law enforcement officers posed as sex buyers, or "johns," to locate active online

3    advertisements of individuals appearing to be minors offering commercial sex

4    services in San Diego, California. UCs then directed these individuals to the

5    Homewood Suites by Hilton San Diego Hotel Circle/SeaWorld Area, 2201 Hotel

6    Circle S, San Diego CA 92108 (Homewood Suites) in the Southern District of

7    California, where rooms were reserved to carry out the operation. Task Force

8    Officers (TFO's) and San Diego Police Department (SDPD) uniformed officers set

9    up surveillance in and around the Homewood Suites to watch for and detect

10   individuals arriving for their commercial sex dates or any individuals believed to

11   be acting as sex traffickers once a victim was dropped off at the hotel.

12   *Contact with MF*

13       30.    As part of OCC, FBI and TFO's searched law enforcement databases

14   for commercial sex advertisements for individuals who appeared to be underage,

15   in order to arrange meeting with those individuals. They located an advertisement

16   on the website, www.megapersonals.eu[1] offering "incalls" and "outcalls" in San

17   Diego, which, based on my training and experience, I know to refer to when a sex

18   buyers either comes to a sex worker's location, or when a sex worker goes to the

19   sex buyer's location, to engage in commercial sex activities. The advertisement

20   contained multiple photographs of a young looking female. On August 10th, 2022,

21   at approximately 8:56 PM, a UC officer contacted the phone number listed in the

22   advertisement, XXX-XXX-1776, using a recorded phone line. During the

23   communications, the UC officer negotiated with the user of the phone, a female

24   later identified as a 15-year-old runaway (MF), to receive sexual favors in

25   _____

26   [1] In my training and experience, I am familiar with megapersonals.eu, which is a

27   website operating in interstate commerce that is used to post advertisements
     offering commercial sex.

exchange for money; specifically, "full service" for one hour in exchange for $300.00. Based on my training and experience, I am aware that the slang term "full service" is commonly used to refer to vaginal intercourse and oral copulation. The UC officer instructed the user of the phone to meet at the Homewood Suites. On August 10th, 2022, at about 9:51 PM, MF arrived at the Homewood Suites.

31.     MF was observed by law enforcement surveillance units exiting the backseat of a Toyota Corolla bearing California license plates. Two males were observed in the front seats. The driver was later identified as NEELY. MF was observed as she proceeded to the hotel room as directed by the UC officer. MF knocked on the hotel room door and met with a UC officer, who allowed MF to enter the room. MF was then contacted by law enforcement wearing identifiable clothing/outer-vest marked POLICE. MF self-identified as being a 15-year-old runaway and provided TFO's with her true name and date of birth. MF was found to be in possession of a cellular telephone and a Super 8 hotel key card, both of which were seized. MF's clothing and physical description matched that of the female seen by surveillance units exiting the backseat of the Toyota Corolla.

32.     Meanwhile, surveillance units maintained a constant visual of the Toyota Corolla which had not left the area and was still parked along the curb line in front of the Homewood Suites. Uniformed SDPD officers were directed to detain the occupants of the Toyota. The driver (NEELY), and the front seat passenger, were detained without incident and transported to the SDPD Western Substation for processing.

33.     MF was interviewed by TFOs. She denied that NEELY or the other passenger of the car were involved in trafficking her, claimed that they did not know of her involvement in prostitution, and stated that she had only met them that day. MF stated she was staying in the Super 8 located in Hotel Circle. She stated the hotel was paid for by a sex buyer or "john" who had since left; she said that

11

1   she remained in the room and left a second cellular telephone in the room. MF

2   provided investigators with both of her phone numbers. During the interview, she

3   consented to a search of the cellular telephone that was with her when she was

4   contacted by law enforcement. After the interview, Investigators searched her

5   cellular telephone and found text messages between MF and NEELY. NEELY's

6   contact was saved in MF's phone as "Wes" and was the same phone number, XXX-

7   XXX-0933, that NEELY provided to officers as belonging to him. In those

8   messages, which began on July 29th, 2022 and continued until August 10th, 2022,

9   investigators located messages that, in my training and experience, indicated

10  NEELY was directing MF's commercial sex activities. For example, NEELY

11  requested MF to send him photos of herself for the use of posting prostitution

12  advertisements. MF and NEELY also had a conversation regarding his transporting

13  MF to the Homewood Suites for an "outcall." And, on or about August 1st, 2022,

14  MF sent NEELY a picture of herself with the words "15 yr old placement run

15  away" superimposed above her head. Additionally, MF sent a text message to an

16  unknown individual containing an address next door to the Super 8 hotel in El

17  Cajon, California.

18  *Neely's Statements*

19      34.    NEELY waived his Miranda Rights and agreed to speak with

20  investigators. He stated that he met MF through Instagram and later maintained

21  contact with her via cellphone. He acknowledged sending and receiving the text

22  messages detailed above. NEELY stated he is aware MF is involved in prostitution

23  but denied collecting her prostitution earnings and denied knowledge that she is a

24  minor. NEELY described his role as protecting MF from her prior pimp and

25  assisting MF in her prostitution dealings by providing transportation and arranging

26  for her online advertisements to be posted. NEELY stated that on August 10, 2022,

27  he picked up MF from a hotel on Magnolia Avenue in the city of El Cajon,

California. Based on investigator's familiarity with the area, they believed the hotel to be the Super 8 located at 471 Magnolia Avenue, El Cajon, California, located in the Southern District of California.

35.    NEELY was arrested and booked into San Diego County Jail, and later transported to the San Diego Metropolitan Correctional Center (MCC).

*Follow-Up Investigation and Identification of AF*

36.    On August 11th, 2022, Investigators went to the El Cajon Super 8 and requested to view the registry. Investigators found that NEELY rented room #215 for the night of August 10th, 2022. Hotel staff stated that NEELY frequents the hotel with another female (later identified as AF). The hotel staff stated AF had come to the office that morning (August 11th) and paid in cash for an additional night in room #215. The hotel did not draw a new registry for this transaction due to AF paying in cash. Hotel staff showed investigators a video of AF, which investigators photographed. A Chula Vista Police Department (CVPD) detective recognized and positively identified AF.

37.    Also on August 11, 2022, Investigators searched for commercial sex advertisements associated with NEELY's phone number, XXX-XXX-0933, and located an advertisement dated August 3rd and 4th, 2022 posted to www.megapersonals.eu, and picturing AF. Investigators set up surveillance of room 215 at the Super 8 hotel and observed AF entering and exiting the hotel several times.

38.    Based on the above, Investigators requested and obtained authorization to search AF's person and room #215, pursuant to California State search warrant #2208111709-OTH-JZW-SW.

39.    On August 11th, 2022, at about 5:30 p.m., SDHTTF TFOs contacted AF and searched her person and room 215. Within room 215, TFO's located two iPhone 11s that AF identified as belonging to her. Also located was a debit card,

13

1  Social Security Card, and California Driver's License bearing NEELY's name. All
2  items were seized in accordance with the search warrant and later logged into
3  evidence.

4      40.    After the search, investigators interviewed AF. AF stated that she has
5  known NEELY for approximately one year. The two have been in a dating
6  relationship since May of 2022, that began about one week prior to AF's 18th
7  birthday. She stated NEELY is aware of her involvement in commercial sex and
8  does not support her involvement. She stated NEELY does not benefit or assist her
9  in commercial sex activities. When asked about why his phone number is listed in
10  AF's recent commercial sex advertisements, AF stated her phone was broken, and
11  therefore she used his phone for her commercial sex activity that day.

12      41.    On August 15th, 2022, investigators searched CashApp[1] for NEELY's
13  reported phone number, XXX-XXX-0933 and located an account titled "wesley
14  neely" and a unique CashTag of "$tfnwes."

15      42.    On August 15th, 2022, investigators searched Instagram for a user
16  "tfnwes" and located an account titled "tfn.wes" (**Target Account 1**). The profile
17  did not have any public posts and featured a profile photo of a dog and a large sum
18  of US currency on the dog. MF's phone download lists MF's Instagram account as
19  "fendididthat" (**Target Account 2**). Investigators searched MF's phone download
20  and located ten Instagram messages between **Target Account 2** and **Target**
21  **Account 1** occurring between August 5th and 7th, 2022. The messages discuss
22  picking up MF and dropping her off around the weekend. Based on these
23  communications, Investigators concluded that "tfn.wes," or **Target Account 1**,
24  belongs to NEELY.

25
26  [1] In my training and experience, I am familiar with CashApp. It is a web-based application that
allows users to transfer money between one another. I am further aware that it is frequently used
as a means to transfer money between a prostituted person and their trafficker and/or to be used
27  to accept payment for sexual services.

43.     Based on the facts of this case, I believe that evidence of sex trafficking crimes may be found on both of the **Target Accounts**. Additionally, the search of the **Target Accounts** may also identify other individuals engaged in sex trafficking.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

44.     Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Facebook (hereinafter "the internet service provider" or "the ISP") are not. It would be inappropriate and impractical for federal agents to search the vast computer network of the ISP for the relevant accounts and then to analyze the contents of those accounts on the premises of the ISP. The impact on the ISP's business would be severe.

45.     Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the Facebook accounts, as described in Attachment B-1. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of the ISP, to protect the privacy of the ISP's subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, the Federal Bureau of Investigation seeks authorization to allow the ISP to make digital copies of the entire contents of the accounts subject to seizure. The copies will be provided to me or to any authorized federal agent. The copies will be imaged and the images will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachments B-1 and B-2. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

46.     Analyzing the data to be provided by the ISP may require special technical skills, equipment, and software.  It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process.  Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang.  Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches.  Keywords search text.  Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISP does not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

47.     Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.  Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachments B-1 and B-2. The personnel conducting the examination will complete the analysis and within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

48. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

49. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification, segregation and extraction of data within the scope of this warrant.

**GENUINE RISK OF DESTRUCTION OF DATA**

50. Based upon my experience and training, and the experience and training of other law enforcement agents with whom I have communicated, electronically stored data may be permanently deleted or modified by users possessing basic computer skills. In this case, a preservation request was submitted to Meta on August 15, 2022; as such, no risk of destruction of data exists.

**PRIOR ATTEMPTS TO OBTAIN DATA**

51. No prior attempts have been made by law enforcement to attempt to obtain data from the **Target Accounts**.

//
//
//
//
//
//
//
//
//

17

## CONCLUSION

52.     Based on the foregoing, I believe there is probable cause to believe items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, 18 U.S.C. §§ 1591 and 2421 as described in Attachments B-1 and b-2 will be found in the properties to be searched, as provided in Attachments A-1 and A-2.

_____
Drew Mycka
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 18 day of August, 2022.

_____
HONORABLE WILLIAM V. GALLO
United States Magistrate Judge

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## ATTACHMENT A-2

## ITEMS TO BE SEARCHED

The property/items to be searched is/are described as follows:

This warrant applies to information associate with the following Instagram User account:

 a. "fendididthat", UID 27458219486 (**Target Account 2**)

**Target Account 2** is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered at 1601 Willow Road, Menlo Park, California.

**ATTACHMENT B-2**

***Particular Things to be Seized***

## II.   Information to be disclosed by Meta Platforms, Inc. ("Meta")

To the extent that the information described in Attachment A-2 is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or other information that has been deleted but is still available to Meta, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on August 15, 2022, Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A-2:

    A.   All business records and subscriber information, in any form kept, pertaining to the account, including:

        1.   Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

        2.   All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

        3.   Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4.   Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

5.   All advertising information, including advertising IDs, ad activity, and ad topic preferences;

6.   Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers from April 1, 2022 up to and including the date of this warrant;

7.   Privacy and account settings, including change history; and

8.   Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken;

B.   All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from April 1, 2022 up to and including the date of this warrant;

C.   All content, records, and other information relating to communications sent from or received by the account from April 1, 2022 up to and including the date of this warrant, including but not limited to:

1.   The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2.   All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

1     3. All records and other information about group conversations and video chats, including dates and times, durations,
2       invitations, and participants (including usernames, account
3       numbers, and date and time of entry and exit); and

4     4. All associated logs and metadata;

5   D. All content, records, and other information relating to all other
6     interactions between the account and other Instagram users from April
7     1, 2022 up to and including the date of this warrant, including but not limited to:

8     1. Interactions by other Instagram users with the account or its
9       content, including posts, comments, likes, tags, follows
10      (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

11     2. All users the account has followed (including the close friends
12      list), unfollowed, blocked, unblocked, muted, restricted, or
13      denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a
14      request to follow the account;

15     3. All contacts and related sync information; and

16     4. All associated logs and metadata;

17   E. All records of searches performed by the account from April 1, 2022
18     up to and including the date of this warrant; and

19   F. All location information, including location history, login activity,
20     information geotags, and related metadata from April 1, 2022 up to and including the date of this warrant.

21 Meta is hereby ordered to disclose the above information to the government within

22

23 14 days of issuance of this warrant.

24

25

26

27

## II.   Search and Seizure of Information by the Government

The search of the data supplied by the ISP pursuant to this warrant will be conducted by the Federal Bureau of Investigation as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited from April 1, 2022 up to and including the date of this warrant. Agents will seize information described above in Section II that constitutes fruits, evidence, or instrumentalities of violations of 18 USC §1591 (Sex Trafficking of Children or by Force, Fraud or Coercion) and 18 U.S.C §2421 (Transportation for Purpose of Prostitution), for the user IDs identified on Attachment A-2, information pertaining to the following matters:

a.   Communications, logs, photos, postings, "likes," activity, and records tending to discuss or establish the sexual exploitation of children; efforts to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, or solicit a person who has not attained the age of 18 years to engage in a commercial sex act; or transportation of any individual in interstate or foreign commerce with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense;

b.   Electronic mail, text or instant messages, communication, chats, posts, profile information, subscriber information, or attachments tending to discuss or establish the sexual exploitation of children; efforts to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, or solicit a person who has not attained the age of 18 years to engage in a commercial sex act; or transportation of any individual in interstate or foreign commerce with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense;

c.   Communications, logs, photos, postings, "likes," activity, and records tending to identify the user of the account and any co-conspirators involved in the illegal activities described in the affidavit;

d.   Communications, logs, photos, postings, "likes," activity, and records that provide context to any communications described above, such as but not limited to electronic messages sent or

29

1    received in temporal proximity to any relevant electronic messages

2    and any electronic messages tending to identify users of the subject account;

3

4    e.   Evidence indicating how and when the Instagram account was accessed or used, to determine context (e.g., chronological,

5    geographic, etc.) of account access, use, and events relating to the crimes under investigation and to the Instagram account owner/user;

6

7    f.   Evidence indicating the Instagram account owner's state of mind as it relates to the crime under investigation;

8

9    g.   The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27